IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:                                           CASE NO. 13- 10013 (ESL)

PLAZA ANTILLANA INC.                             CHAPTER 11

    Debtor

OPINION AND ORDER

This case is before the court upon LSREF2 Island Holdings, Ltd.'s (hereinafter referred to as "Island Holdings") *Motion to Dismiss for Bad Faith or for Cause* filed on December 9, 2013 (Docket No. 6). Island Holdings' motion to dismiss the case for "cause" pursuant to 11 U.S.C. §1112(b) is premised upon the following allegations: (i) Plaza Antillana, Inc. (hereinafter referred to as "Debtor" or "Plaza Antillana") is a Single Asset Real Estate ("SARE") case and the same was filed in bad faith because it satisfies all six (6) Piccadilly factors; (ii) there is "substantial or continuing loss or diminution and absence of a reasonable likelihood of rehabilitation" pursuant to 11 U.S.C. §1112(b)(4)(A) since Debtor has no income to service its debt and there is a substantial and continuing diminution of the estate due to the interest accruing on the secured debt and "[t]here is nothing in this bankruptcy case to suggest that financial viability for this Debtor is reasonably likely in the near future;" and (iii) a plan of reorganization is not feasible for the Debtor because it has no income or an ability to reorganize. Debtor filed its *Reply to LSREF2 Island Holdings, Ltd. Motion to Dismiss for Bad Faith or For Cause* on December 23, 2013 (Docket No. 16). For the reasons stated herein, Island Holdings' motion to dismiss pursuant §1112(b) is hereby granted.

Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(A). Venue of this proceeding is proper under 28 U.S.C. §§1408 and 1409.

-1-

Procedural Background

Plaza Antillana filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on December 2, 2013. The Debtor lists a commercial property in Schedule A (Real Property) with a current value of Debtor's interest in the property of $3.5 million and a secured claim in the amount of $8,842,881.91. The Debtor lists in Schedule D (Creditors Holding Secured Claims) Island Holdings as a secured creditor of a claim in the amount of $8,842,881.91, of which $5,342,881.91 is the unsecured portion. The claim was incurred in the year 2007 as a first mortgage lien over the commercial property. The Debtor lists in Schedule H (Codebtors) Restaurants Investment, Inc. and Antonio Morales Padilla as co-debtors regarding the Island Holdings creditor.

On December 9, 2013, Island Holdings filed a *Motion to Dismiss for Bad Faith or for Cause* arguing that: (i) Plaza Antillana is a SARE case and the same was filed in bad faith because it satisfies all six (6) "Piccadilly" factors[1]; (ii) there is "substantial or continuing loss or diminution and absence of a reasonable likelihood of rehabilitation" pursuant to 11 U.S.C. §1112(b)(4)(A) since Debtor has no income to service its debt and there is a substantial and continuing diminution of the estate due to the interest accruing on the secured debt and "[t]here is nothing in this bankruptcy case to suggest that financial viability for this Debtor is reasonably likely in the near future;" and (iii) a plan of reorganization is not feasible for the Debtor because it has no income or an ability to reorganize (Docket No. 6).  On December 11, 2013, the court ordered the Debtor to file an opposition to Island Holdings' motion to dismiss within 14 days from notice of this Order and upon Debtor's timely response an evidentiary hearing was scheduled for January 7, 2014 (Docket No. 9).

On December 20, 2013, the Debtor filed an *Urgent Motion Requesting Order to Allow Debtor Access to Real Property that Belongs to the Estate* alleging that Island Holdings is continuously violating the provisions of the automatic stay because it is exercising control and

---

[1] See In re Phoenix Piccadilly, Ltd., 849 F. 2d 1393, 1394-1395 (11th Cir. 1988).

-2-

holding possession over the real property of the estate through a security guard company that places 24-hour officer surveillance on the real property, thus affecting the Debtor's ability to reorganize. The Debtor requests the court to Order Island Holdings to terminate its possession of the Debtor's real property (Docket No. 14). On December 20, 2013, Island Holdings filed a *Motion for Entry of Order Denying Debtor's "Urgent" Motion* alleging that the relief requested by Debtor in its Urgent Motion is unwarranted because the Debtor acquiesced to the presence of the security officers at the real property, paid by Island Holdings, to protect the single asset, given that the same has been subject to vandalism and damages in the past. The Debtor and Island Holdings have been in constant communication and, "…Debtor has always been provided access to show the property to prospective tenants." Moreover, the Debtor's Urgent Motion fails to comply with Fed. R. Bankr. P. 7001(7) and PR LBR 9013-2 (Docket No. 15). On December 23, 2013, the court denied the motion filed by the Debtor requesting access to the real property, on the ground that a request for turnover of property of the estate and/or injunctive relief must be initiated as an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(1, 7) (Docket No. 17).

On January 3, 2014, the Debtor filed its *Proffer of Evidence in Support to Debtor's Reply to LSREF2 Island Holdings, Ltd Motion to Dismiss for Bad Faith and for Cause* attaching a sworn affidavit by Mr. Antonio Morales Padilla, principal officer of Debtor, and a title study of the real property dated December 16, 2011 (Docket No. 20). On the same date, the parties filed a *Joint Motion in Compliance with Order* filing their pre-trial report for the scheduled January 7, 2014 evidentiary hearing (Docket No. 21). On January 7, 2014, Island Holdings filed proof of claim #2-1 as a secured creditor of a mortgage loan in the amount of $8,482,881.91.

The evidentiary hearing was held on the scheduled date. The court stated that it will follow its prior ruling in the case of In re Costa Bonita Beach Resort, 479 B.R. 14 (Bankr. D.P.R. 2012), to determine if there is cause for dismissal for bad faith (or lack of good faith) in filing a chapter 11 case. The court heard the testimony of Mr. Juan A. Crespo and Mr. Antonio J. Morales Padilla. The court took the matter under advisement (Docket No. 25).

Findings of Facts

The parties agree that the following facts are uncontested.

1. Island Holdings acquired all of FirstBank Puerto Rico's (predecessor secured creditor, hereinafter referred to as "FirstBank") rights, title and interest in, to and under a certain credit facility and the credit agreement on March 28, 2013 subject to the specific terms of the agreement. Hudson Puerto Rico, LLC ("Hudson") serves as the special servicer for the Loans.

2. The Court of First Instance of the Commonwealth of Puerto Rico, San Juan part, (the "state court") granted a consent judgment against Plaza Antillana, Inc., Restaurants Investment, Inc., and Mr. Antonio Morales Padilla.

3. The state court consent judgment states on the second page that all the parties, including the Debtor have authorized and agreed for FirstBank to execute the mortgages, the various mortgage promissory notes, and the public foreclosure sale of the real property that they guarantee in order to fulfill the payments of the sums indebted.

4. On April 1, 2013, the state court granted judgment in favor of FirstBank. On August 20, 2013, Island Holdings appeared in the case and filed a motion for execution of judgment. The state court granted said motion on September 12, 2013, and issued the corresponding Orders to execute the Judgment as proposed by Island Holdings.

5. A notice of public sale was issued by the state court on October 16, 2013, scheduling the public sale to be held on December 3, 2013. On December 3, 2013, at the public sale, state court counsel was served with a notification of this bankruptcy filing, which was on the eve of the foreclosure, namely, on December 2, 2013.

6. The bankruptcy petition indicates that the Debtor has only one asset, the Plaza Antillana property and four (4) unsecured creditors whose claims total $4,875.00. The Debtor has no employees, directors or officers. The Plaza Antillana property is subject to a foreclosure action as a result of arrearages on debt with Island Holdings. The Debtor's

-4-

financial problems are essentially a dispute between the Debtor and Island Holdings, whose secured debt accounts for 99.994% of Debtor's entire scheduled indebtedness.

7. This is a single asset real estate case pursuant to 11 U.S.C. §101(51B).

8. On September 5, 2007, Plaza Antillana entered into a certain construction agreement (as amended, supplemented, replaced, restated or otherwise modified from time to time) with FirstBank, pursuant to which FirstBank made available to Plaza Antillana an interim construction loan in the aggregate principal amount of $5,525,000.

9. On December 30, 2008, Plaza Antillana entered into a certain First Amendment to the Construction Loan Agreement with FirstBank, by which FirstBank increased Plaza Antillana's credit facility in the amount of $960,000, thereby increasing the aggregate principal amount of the credit facility to $6,485,000.

10. On October 23, 2009, Plaza Antillana entered into a certain Second Amendment to Construction Loan Agreement with FirstBank, by which FirstBank increased the Debtor's credit facility in the amount of $550,000, thereby increasing the aggregate principal amount of the credit facility to $7,035,000.

11. On March 5, 2010, Plaza Antillana entered into a certain Third Amendment to Construction Loan Agreement with FirstBank, by which FirstBank increased the Debtor's credit facility in the amount of $750,000, thereby increasing the aggregate principal amount of the credit facility to $7,785,000.

12. On August 12, 2011, Plaza Antillana entered into a certain Fourth Amendment to Construction Loan Agreement with FirstBank, by which FirstBank increased Plaza Antillana's credit facility in the amount of $700,000, thereby increasing the aggregate principal amount of the credit facility to $8,485,000.

13. On August 12, 2011, Plaza Antillana, Restaurants Investments, Inc. and Antonio Morales Padilla and FirstBank entered into a Forbearance Agreement (as amended, restated, supplemented, replaced or otherwise modified from time to time), pursuant to

-5-

which FirstBank agreed to forbear from exercising its rights under the credit agreement during the forbearance period as defined in the Forbearance Agreement.

14. As of the petition date, the principal balance of the credit facility is approximately $8,842,881.91.

15. The credit facility is secured by the following mortgage liens pledged in favor of or made to the order of FirstBank (collectively, the "Mortgage Notes"):

   a. Mortgage Note in the principal amount of $4,737,000 entered into by Plaza Antillana in favor of FirstBank on September 5 2007, under affidavit number 4,119 of Notary Public Carmen A. Guzman and secured by Deed Number 21 of even date and subscribed before the same Notary. Said Mortgage Note and Mortgage were amended as follows: (i) modified and increased to the principal amount of $5,697,000 on December 30, 2008 pursuant to Deed Number 35 of Notary Public Edda Ivette Rodriguez; (ii) modified and increased to the principal amount of $6,247,000 on October 23, 2009 pursuant to Deed Number 37 of Notary Public Edda Ivette Rodriguez; (iii) modified and increased on March 5, 2010 to the principal amount of $6,997,000 pursuant to Deed Number 57 of Notary Public Edda Ivette Rodriguez; and (iv) modified and increased on August 12, 2011 to the principal amount of $7,697,000 pursuant to Deed Number 57 of Notary Public Edda Ivette Rodriguez.

   b. Mortgage Note in the principal amount of $175,000 entered into by Plaza Antillana in favor of FirstBank on July 13, 2007 under affidavit number 4,097 of Notary Public Carmen A. Guzman and secured by Deed Number 15 of even date and before the same Notary.

   c. Mortgage Note in the principal amount of $163,000 entered into by Plaza Antillana in favor of FirstBank on June 12, 2007 under affidavit number 4,047 of

Notary Public Carmen A. Guzman and secured by Deed Number 12 of even date and before the same Notary.

d. Mortgage Note in the principal amount of $30,000 entered into by Plaza Antillana in favor of FirstBank on November 14, 2008 under affidavit number 4,278 of Notary Public Carmen T. Saliceti Maldonado and secured by Deed Number 13 of even date and before the same Notary.

16. The Mortgage Notes encumber a certain property located in the Sabana Llana Ward of San Juan and is registered in the Property Registry of Puerto Rico, Fifth Section of San Juan. This property (parcel) was formed by a deed of grouping which was filed and is pending recordation in the Registry at entry number 1,037 of the Book of Daily Entries number 880.

17. On or about September 5, 2007, the Debtor's affiliated company, Restaurants Investment, executed guaranties for re-payment of the credit facility under affidavit number 4,123 of Notary Public Carmen A. Guzman. In addition, on or about August 12, 2011, each of the Debtors executed a Consent Judgment which provides for the entry of judgment against the Debtors for the full amount due under the credit facility, the foreclosure of the property, the guaranty of payment of the full amount of the credit facility by the Debtors, and further provides for the cross collateralization of each of the credit facility. There is no equity in the collateral.

18. On or about November 14, 2008, the Debtor's affiliated company, GM Multystems Corporation, executed guaranties for the re-payment of the credit facility under affidavit 4,282 of Notary Public Carmen A. Guzman.

<u>The Hearing</u>

During the hearing the court made the following finding: Mr. Antonio Morales Padilla has not been granted ready access to market the commercial property to prospective tenants. This finding was made by the court.

-7-

*Testimony of Mr. Juan Antonio Crespo Figueroa*

Mr. Juan Antonio Crespo Figueroa, has a bachelor's degree in business administration with a concentration in accounting and finance and is currently in law school. He is currently an account manager for Hudson Puerto Rico, and administers loans for financial institutions. Hudson Puerto Rico is a service provider that manages the assets (mainly commercial loans) owned by Island Holdings. He has reviewed all the documents related to the account and assets of Plaza Antillana, such as; collateral documents, the loan agreements, mortgage notes, security logs, and all correspondence related to the credit file of Plaza Antillana.

Mr. Crespo testified that the real property is not completed because it needs some capital investments and, thus, is not ready for tenants to occupy the same. He stated that the outside of the property is finished, but the inside of the property needs work in order for tenants to occupy the property. The real property has been vandalized. Security guards were contracted to look over the property to prevent vandalism because the property is located in a neighborhood that is known for being unsafe. The commercial property does not have the necessary use permits to operate. Hudson has paid for the insurance over the property and also pays for the security services.

Mr. Crespo testified that the Debtor visited the property twice before the bankruptcy filing and once after the bankruptcy filing. He stated that for the Debtor to access the property he needs to identify himself and show his identification to the security guard.

*Testimony of Mr. Antonio J. Morales Padilla*

Mr. Antonio Jose Morales Padilla is a developer and contractor, and the President and stockholder of Plaza Antillana. Mr. Padilla stated that Plaza Antillana was created to build a shopping mall on land that he owned for more than 10 years. The Debtor obtained financing to construct the mall with FirstBank. The initial loan was for 20,000 square feet. However, there was demand for additional square footage. Thus, the Debtor requested additional financing from FirstBank, and the latter provided another loan for an additional 20,000 square feet. FirstBank

also gave Debtor another loan for buying 3 houses which were going to be used as additional parking for the mall.

Mr. Morales testified that in the year 2010, FirstBank was having capital liquidity problems, and the bank would delay the loan disbursements to the Debtor for a period of 90-120 days. This resulted in the Debtor having to obtain a new loan. FirstBank would then add again the interest, legal fees and closing costs to this new loan. The delay in the loan disbursements also affected the payments to the subcontractors which would leave the project, if they would not get paid. In addition in the year 2010-2011, the prices of the cement and the construction materials increased. The court does not give value to Mr. Morales' conclusions regarding FirstBank's liquidity.

Mr. Morales stated that he rented 47% of the commercial property. The contracts were drafted by attorney Pedro Toledo. FirstBank, due to its financial problems, kept them waiting for the loans and the contracts were never realized. The shopping center is certified by the architect and the inspector of the bank. The property has one or two things that need to be fixed, but the same could be fixed with $15,000 to $20,000. In the year 2012, FirstBank asked if it could change the company that offered security services to the property, and he replied that it made no difference to him if it changed the company that provided the security services. He said that he could pay for the insurance and the security services for the property if he could access his office and if they would permit him to rent the property.

Mr. Morales further stated that on March 2013 he was informed by Mr. Carlos Navarro that the bank will be selling his loan with some other loans. He testified that when Island Holdings bought the loan, it did not let him access the property. Mr. Morales stated that to access the property he has to first call a person in Texas to coordinate a date to visit the property.

Mr. Morales stated that he has several prospective tenants such as: (i) CESCO which is interested in leasing 20,000 square feet at $18 per square feet which would yield $370,000 plus the CAM which would be an additional $160,000 to $170,000; (ii) the Department of Health is

interested in leasing 10,000 square feet; and (iii) attorney Agustin Diaz has contacted Mr. Morales because his client which is a health provider that specializes in kidneys is interested in leasing 7,000 square feet. He has a list of 60 prospective tenants, but does not have letters of intent of any of these prospective tenants. He also testified that the property has not been vandalized during the last 10 years.

The court inquired if there was a recent appraisal of the property. Island Holdings replied that the most recent appraisal it had is dated March 17, 2011 and the property was valued in the following manner: (i) upon completion $3 million; (ii) $4.5 million prospective market value upon stabilized occupancy; and (iii) as is $2.7 million. Island Holdings informed the court that it had requested an appraisal of the property.

Applicable Law and Analysis

*Dismissal pursuant to 11 U.S.C. §1112(b)(4)*

Section 1112(b) of the Bankruptcy Code mandates the bankruptcy court, after notice and a hearing, to convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes cause and the case is devoid of unusual circumstances pursuant to 11 U.S.C. §1112(b)(2). 11 U.S.C. §1112(b)(1). Section 1112(b)(4) of the Bankruptcy Code fails to define what the term "cause" means but provides a  list of circumstances which constitute "cause" for conversion or dismissal. This list of causes is nonexhaustive, thus a case may be converted or dismissed for other causes. See AmeriCERT, Inc. v. Straight Through Processing, Inc. (In re AmeriCERT, Inc.), 360 B.R. 398, 401 (Bankr. D. N.H. 2007).

The initial burden is on the movant to argue and present evidence by a preponderance of the evidence standard to prove its position that there is cause for either conversion or dismissal of the chapter 11 case, whichever is in the best interests of creditors and the estate. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[4] (16th ed. 2013). "Thus, until

-10-

the movant carries the burden, the statutory direction that the court 'shall convert the case to a case under chapter 7 or dismiss the case' is not operative." Id. The court, after finding cause, has broad discretion to determine whether conversion or dismissal is in the best interest of creditors and the estate. See Gilroy v. Ameriquest Mortg. Co. (In re Gilroy), 2008 Bankr. Lexis 3968 (B.A.P. 1st Cir. 2008); 2008 WL 4531982. However, if the movant proves that there is cause for dismissal pursuant to 11 U.S.C. §1112(b)(4) by the preponderance of the evidence standard, the court must find that movant has established cause. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[4] (16th ed. 2012).

Once "cause" has been established, the burden shifts to the debtor to identify unusual circumstances that evince that conversion or dismissal is not in the best interest of creditors and the estate. Even, if there are no unusual circumstances, the court may not convert or dismiss a case if the debtor establishes and the court finds that: "(1) there is a reasonable likelihood that a plan will be confirmed within a reasonable time; (2) the 'cause' for dismissal or conversion is something other than a continuing loss or diminution of the estate coupled with a lack of reasonable likelihood of rehabilitation; and (3) there is a reasonable justification or excuse for a debtor's act or omission and the act or omission will be cured within a reasonable time." In re Orbit Peroleum, Inc. 395 B.R. 145, 148 (Bankr. D. N.M. 2008).

*Lack of Good Faith (or Bad Faith)*

This court inIn re Costa Bonita Beach Resort Inc., 479 B.R. 14 (Bankr. D.P.R. 2012) held that lack of good faith (or bad faith) in filing a Chapter 11 petition constitutes "cause" to dismiss a Chapter 11 petition pursuant to 11 U.S.C. §1112(b)(1). This court also rejected the use of the mechanical checklist approach to determine lack of good faith (or bad faith) for all cases, irrespective of whether they fall under the SARE category pursuant to 11 U.S.C. §101(51B). The

-11-

court held the following in In re Costa Bonita Beach Resort Inc., regarding lack of good faith (or bad faith) as a cause for dismissal of a Chapter 11 petition:

"Good faith is not a statutory requirement for the filing of a Chapter 11 petition. However, it is a requirement for a Chapter 11 plan to be confirmed. 11 U.S.C. §1129(a)(3). The unsettled issue is whether lack of good faith (or bad faith) may constitute "cause" to dismiss a Chapter 11 petition under 11 U.S.C. §1112(b)(1). See Ali M.M. Mojdehi & Janet Dean Gertz, *The Implicit "Good Faith" Requirement in Chapter 11 Liquidations: A Rule in Search of a Rationale?,* 14 Am. Bankr. Inst. L. Rev. 143 (2006). Any determination of good faith, or lack of good faith (bad faith) is fact intensive and must consider the totality of the circumstances on a case by case basis. In Chapter 11 cases the court must carefully consider the distinctions between liquidation and reorganization as both are valid objectives under the Bankruptcy Code.

Several Circuits have determined that lack of good faith (or bad faith) in filing a chapter 11 bankruptcy petition constitutes "cause" to dismiss or convert a case to Chapter 7 pursuant to 11 U.S.C. §1112(b). See Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.), 779 F. 2d 1068 (5th Cir. 1986); In re Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture), 936 F. 2d 814 (5th Cir. 1991); Carolin Corp. v. Miller, 886 F. 2d 693 (4th Cir. 1989); Trident Assocs. Ltd. Partenership v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. Partnership), 52 F. 3d 127 (6th Cir. 1995); NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108 (3rd Cir. 2004); In re Albany Partners, Ltd., 749 F. 2d 670 (11th Cir. 1984). The First Circuit has not decided whether lack of good faith (or bad faith) in the filing of a Chapter 11 bankruptcy petition constitutes "cause" under 11 U.S.C. §1112(b). See Fields Station LLC v. Capitol Food Corp. (In re Capitol Food Corp.), 490 F. 3d 21, 24 (1st Cir. 2007). One court declined the proposition that 11 U.S.C. §1112(b) imposes a good faith filing requirement in a SARE case. See In re Victoria Ltd. Partnership, 187 B.R. 54, (Bankr. D. Mass. 1995).

The First Circuit has determined that if 11 U.S.C. §1112(b) imposes a good faith filing requirement, then it is the movant that must establish *prima facie* that the petition was filed in bad faith before the burden shifts to the debtor. See In re Capitol Food Corp., 490 F. 3d at 24 ("Although the bankruptcy court held that subsection 1112(b) imposes no good faith filing requirement, we need not address this matter in the present case. Even the courts which have found a good faith filing requirement would demand that Fields Station first make a *prima facie* showing that Capital Food filed its petition in bad faith."); Farnsworth v. Morse (In re Farnsworth), 2009 Bankr. Lexis 3699, *18, (B.A.P. 1st Cir. 2009); In re Miller, 2009 Bankr. Lexis 3351, *4 (Bankr. D. Mass. 2009). The First Circuit noted that, "[c]atastrophic business events, such as an imminent or threatened foreclosure on the debtor's interests in real property essential to successful

-12-

reorganization efforts, are precisely the sort of imminent financial distress for which debtors routinely seek chapter 11 protection." In re Capitol Food Corp., 490 F. 3d at 25 citing In re Liberate Techs., 314 B.R. 206, 216 (Bankr. N.D. Cal. 2004). The First Circuit also observed that a good faith petition must seek to preserve or create some value that would otherwise be lost outside of bankruptcy and that it is not bad faith to seek to gain an advantage from declaring bankruptcy. Id. at 25.

The determination of whether the movant has established *prima facie* that there is a lack of good faith (or bad faith) in the filing of a bankruptcy petition is a fact intensive inquiry in which the court analyzes the totality of the circumstances. See In re Farnsworth, 2009 Bankr. Lexis 3699, *20 citing Marrama v. Citizens Bank of Mass. (In re Marrama), 430 F. 3d. 474, 482 (1st Cir. 2005) aff'd, 549 U.S. 365 (2007). Lack of good faith or bad faith is atypical conduct that constitutes an abuse of the bankruptcy process. See Marrama v. Citizens Bank, 549 U.S. 365, 375, fn. 11 (U.S. 2007); Berliner v. Pappalardo (In re Puffer), 674 F. 3d 78, 82 (1st Cir. 2012). Good faith is driven by the congressional intent of Chapter 11 relief. "Chapter 11 is designed to offer greater recovery for creditors and equity owners than liquidation in a Chapter 7 case by providing a means by which financially distressed businesses or individuals may restructure their finances by obtaining confirmation of a plan which provides either a continuation of the business, or retention or orderly sale of assets, and exiting bankruptcy relieved of burdensome debts and obligations." Hon. Nancy C. Dreher & Hon. Joan N. Feeney, Bankruptcy Law Manual, §11.1 (5th ed. 2011).

The totality of the circumstances test cannot be reduced to a mechanical checklist (irrespective of the chapter or whether it is in the filing of the petition and/or the confirmation of the plan). See In re Puffer, 674 F. 3d at 81 ("The totality of the circumstances test cannot be reduced to a mechanical checklist, and we do not endeavor here to canvass the field and catalogue the factors that must be weighed when determining whether a debtor has submitted a Chapter 13 plan in good faith"). The First Circuit has determined that, "in all events, good faith is a concept not a construct. Importantly, it is a concept that derives from equity. This matters because equitable concepts are particularly insusceptible to per se rules." In re Puffer, 674 F. 3d 78, 82. Thus, this court, in conformity with the determinations of the First Circuit in In re Puffer rejects the mechanical checklist approach for a determination of lack of good faith (or bad faith) for all cases, irrespective of whether they are SARE cases. Good faith is an abstract idea generalized from particular circumstances and not a working assumption." Id. 479 B.R. at 39-40.

Island Holdings alleges that the Debtor filed its bankruptcy petition in bad faith because all of the six (6) Picadilly factors as set forth in the case of In re Phoenix Piccadilly, Ltd., 849 F.

-13-

2d 1393 (11th Cir. 1988) are met. The six (6) factors, as applied to this case, are the following: (i) the Debtor has only one asset which is Plaza Antillana; (ii) the Debtor has very few unsecured creditors whose claims total $4,875 as evidenced from Schedule F (Creditors Holding Unsecured Nonpriority Claims); (iii) the Debtor has no employees, no officers and no directors; (iv) the foreclosure of the commercial property was consented by the Debtor on August 12, 2011; (v) this is a two party dispute between the Debtor and secured creditor Island Holdings and there is no viable business operation and no benefit to unsecured creditors. This two party dispute can be resolved in the pending state court action; and (vi) the timing of the Debtor's filing was an intent to delay or frustrate the efforts of the secured creditor to enforce its rights because the foreclosure was scheduled for December 3, 2013 and the Debtor filed for bankruptcy on December 2, 2013.

The fact that the Debtor is a SARE case is not by itself indicia of a bad faith filing. The fact that there was a pending foreclosure of Debtor's property in state court by its secured creditor and that Debtor probably filed the instant case to benefit from the provisions of the automatic stay to prevent Island Holdings from foreclosing on its property and exercising its remedies is generally the main reason as to why debtors in financial distress seek Chapter 11 protection. See In re Capitol Food Corp., 490 F. 3d at 25; See also; H. Miles Cohn, *Good Faith and the Single Asset Debtor*, 62 Am. Bankr. L.J. 131 (1988). The Piccadilly factors enumerated by Island Holdings are the "mechanical checklist" to which SARE cases, by their very nature, have been circumscribed to by some Circuits. Although this court in In re Costa Bonita Beach Resort, Inc., rejected the application of a "mechanical checklist" and adopted the totality of the circumstances standard, such rejection does not mean that the Piccadilly factors are not relevant. In fact, they are, and should be considered under the totality of the circumstances.

-14-

The total current value of Debtor's real estate is $3,500,000.00 as disclosed in Schedule A- Real Property (Docket No. 1). Island Holdings has a first mortgage over Debtor's commercial property (Docket No. 1, Schedule A). Island Holdings is the Debtor's only secured creditor and has a mortgage claim which amounts to $8,842,881.91 of which $5,342,881.91, the Debtor lists as the unsecured portion of the claim (Docket No.1, Schedule D). The Debtor lists four (4) unsecured priority claim holders and assigns for only one (1) claim a dollar figure, the Workmen's Compensation claim in the amount of $79,000. (Docket No. 1, Schedule E-Creditors Holding Unsecured Priority Claims). Island Holdings is the only secured creditor and also the largest unsecured creditor, as the Debtor so admits by listing Island Holdings as having an unsecured claim in the amount of $5,342,881.91.

The uncontested facts clearly show that there is no equity for the benefit of the estate. The most recent appraisal dated March 17, 2011 valued the commercial property under the three (3) following scenarios: (i) upon completion $3 million; (ii) $4.5 million prospective market value upon stabilized occupancy; and (iii) as is, $2.7 million. At this juncture, in order for the commercial property to be leasable, certain improvements need to be made to the property. Moreover, Plaza Antillana currently does not have the necessary use permits to operate the commercial property.

The court finds that even under the best scenario, with stabilized occupancy and a prospective market value of $4.5 million, there are insufficient funds available to satisfy the secured creditor's debt. Thus, unfortunately, in this case there is really no asset maximization or preservation of value to benefit the unsecured creditors, and even if there was, the listed unsecured creditors' claims total only $4,875. Moreover, there is no on-going business operation that generates cash or income for the Debtor to pay its secured creditor, or to adequately protect

-15-

its secured creditor, or to pay the Debtor's operational expenses, such as the insurance policy for the property and the security services. Debtor's reasons for filing its Chapter 11 petition do not align with the First Circuit's view that the "[t]wo primary purposes of chapter 11 relief are the preservation of businesses as going concerns, and the maximization of the assets recoverable to satisfy unsecured claims." In re Capitol Food Corp., 490 F. 3d at 25.

The court concludes that Island Holdings has established *prima facie* that Debtor filed its bankruptcy petition in bad faith. The desperate resort to filing for bankruptcy on the eve of a consented foreclosure, without ongoing operations and inability to service the secured debt, is atypical conduct which constitutes an abuse of the bankruptcy process.

*11 U.S.C. §1112(b)(4)(A)*

Island Holdings also requests dismissal of the this case based upon 11 U.S.C. §1112(b)(4)(A). Section 1112(b)(4)(A) provides that cause includes, "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. §1112(b)(4)(A); See In re DCNC N.C. I, LLC, 407 B.R. 651, 664 (Bankr. E.D. Pa. 2009). This particular "cause" consists of two (2) requirements which must be satisfied. "First, it tests whether, after the commencement of the case, the debtor has suffered or continued to experience a negative cash flow, or, alternatively declining asset values. Second, it tests whether there is any reasonable likelihood that the debtor, or some other party, will be able to stem the debtor's losses and place the debtor's enterprise back on a solid financial footing within a reasonable amount of time." Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[6][a] (16th ed. 2013).

The court finds that the first prong under Section 1112(b)(4)(A) has been satisfied, as Debtor generates no income because there is no on-going business and thus, is unable to pay for

the commercial property's expenses, such as the property insurance policy and the security services. At this juncture, it is uncertain the amount of time it would take to get the commercial property ready to commence operations, given that it does not have the use permits to operate and improvements on the property are necessary to commence operations. In addition, there are no letters of intent from prospective tenants.

The second prong under Section 1112(b)(4) is whether the debtor has a reasonable likelihood of rehabilitation. Rehabilitation has been defined as whether the debtor will be able to reestablish its business. "...the standard under section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort. Rehabilitation is not another word for reorganization. Rehabilitation means to reestablish a business. Whereas, confirmation of a plan could include a liquidation plan, rehabilitation does not include liquidation." Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[6][a][ii] (16th ed. 2013). "Instead, rehabilitation signifies something more, with it being described as 'to put back in good condition; re-establish on a firm, sound basis.'" In re Creekside Senior Apts., L.P., 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013) citing In re Westgate Props., Ltd., 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010) (quoting In re V. Cos., 274 B.R. 721, 725 (Bankr. N.D. Ohio 2002)). "Rehabilitation is the restoration of a business' vitality and depends on whether the debtor can formulate within a reasonable amount of time a reasonably detailed business plan." In re 221-06 Merrick Blvd. Assocs. LLC, 2010 Bankr. Lexis 4431, *5 (Bankr. E.D.N.Y. 2010). The purpose of Section 1112(b)(1) is to "preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." Loop Corp. v.

United States Tr., 379 F. 3d 511, 516 (8th Cir. 2004) (quoting In re Lizeric Realty Corp., 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)).

The court finds that in this case it is not about reestablishing a business, but rather establishing one; namely the business of a commercial property that generates rental income. As stated before, it is uncertain the amount of time it would take to get the Debtor to commence business operations, as the Debtor does not have the necessary use permits to operate the commercial property and some improvements are necessary on the property. In addition, there are no letters of intent from prospective tenants. The court finds that the second prong under section 1112(b)(4)(A) has been satisfied because Plaza Antillana's business prospects do not justify continuance of the reorganization effort since there is no business or operations to reestablish. The Debtor is simply devoid of a business operation that serves as the basis to structure its reorganization effort. Thus, it is unlikely that the Debtor will be able to generate sufficient cash flow to service its debt to Island Holdings. "A debtor who is unable to service its debt at the outset of the case and remains unable to do so for the foreseeable future does not have a reasonable likelihood of rehabilitation." See In re Creekside Senior Apts., L.P., 489 B.R at 62 (quoting In re Fall, 405 B.R. 863, 869 (Bankr. N.D. Ohio 2009)). Moreover, there are no "unusual circumstances" in this case that evince that conversion or dismissal is not in the best interest of creditors and the estate. Thus, the court finds that there is cause for dismissal of the chapter 11 case under 11 U.S.C. §1112(b)(4)(A).

Conclusion

In view of the foregoing, the court grants Island Holdings' motion to dismiss the instant case for cause pursuant to 11 U.S.C. §1112(b)(4)(A) and for the Debtor's lack of good faith (or bad faith) in the filing of this bankruptcy petition.

SO ORDERED.

In San Juan, Puerto Rico, this 14th day of February, 2014.

Enrique S. Lamoutte
United States Bankruptcy Judge